STATE EX REL. CLARK, RELATOR, *v.* DISTRICT COURT
ET AL., RESPONDENTS.

(No. 2,085.)

(Submitted October 29, 1904.  Decided December 8, 1904.)

*Jury—Making Jury List—Regularity—Who May Question—
Time of Service.*

1.   A member of a jury commission, who, by his own misconduct in office as a member of such commission, has rendered the making of the jury list so irregular that as to others it might be invalid, cannot take advantage of. his own wrongdoing when called on to answer a criminal charge presented by a grand jury selected from such jury list.
2.   Under Code of Civil Procedure, Section 245, providing that "the persons whose names are so returned are known as regular jurors and will serve for one year and until other persons are selected and returned," a grand jury organized in December, 1903, from the jury list of that year, and not discharged by the court, may return a valid indictment though the jury list for 1904 may have been made and filed before the date of the indictment.

ORIGINAL application by the state, on the relation of William D. Clark, for a writ of prohibition to the Second Judicial District Court and to the Honorable E. W. Harney, district judge. Dismissed.

*Mr. C. F. Kelley, Mr. E. S. Booth,* and *Mr. E. M. Lamb,* for Relator.

*Mr. Peter Breen,* and *Mr. Dan. Yancey,* for Respondents.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

On January 23, 1903, the jury commissioners of Silver Bow county presented to the clerk of the district court of that county a list of names of persons selected for jury service for the year 1903, containing about 4,500 names, to which list the following sworn statement was attached:

"Butte, Mont., Jan. 22, 1903.

"Mr. Sam Roberts—Dear Sir: We, the undersigned county officials, beg leave to submit report relating to selection of jurors. Sec. 240, 241 and 242 (Penal) Code of Civil Procedure governs the same. This is to certify that Wm. D. Clark, Chairman of County Commissioners, James Maher, Treasurer, and Daniel Brown, Assessor, all officials of Silver Bow county, state of Montana. That the aforesaid Co. officials met in the office of the county clerk on the second Monday in January at 10 A. M. and selected said jury from the regular assessment roll of 1903. And said list of jurors is correct and accurate. Respectfully yours,

"William D. Clark, County Commission.
"James Maher, County Treasurer.
"Daniel Brown, County Assessor.

"Subscribed and sworn to before me this 23d day of January, A. D. 1903.

"Samuel M. Roberts, Clerk.
"[District Court Seal.]"

On December 23, 1903, in Department No. 1 of the district court of Silver Bow county, an order was made directing the impaneling of a grand jury. This order was executed, and such grand jury, having been impaneled and charged, proceeded to the investigation of matters called to its attention, and afterwards returned into court an accusation in writing, charging W. D. Clark with various acts of misfeasance and malfeasance in office; W. D. Clark being a member of the board of county commissioners, chairman of such board, and the same person who, as such chairman, verified the list of persons selected for jury service as above set forth. This grand jury also returned numerous indictments against Clark, who was thereafter ar-

rested and admitted to bail, and, when arraigned, made objection to the accusation and to the several indictments on a number of grounds, particularly specifying, among others, that the list of jurors from which the panel of grand jurors was selected was not drawn in accordance with the provisions of the law, in that (a) the jury commissioners did not meet at the time and place designated by law for drawing such list; (b) that the list of names returned to the district clerk was not drawn from the assessment roll for 1902; (c) that such list was not selected by the jury commissioners, or a majority of such board acting as such, but by one Lottie C. Smith, a nonofficial person, who selected such list from a nonofficial list of persons, and that such list contains names of persons whose names do not appear on such assessment roll.

Upon the trial of this objection or challenge evidence was heard by the court, from which it appeared that on the second Monday of January, 1903, the chairman of the board of county commissioners, the county treasurer and the county assessor met in the county clerk's office; that they employed Lottie C. Smith, a typewriter, to write down the names; that each of the commissioners separately called off some of the names comprised in the list from a book used by the assessor's deputies in making assessments; that a considerable portion of the names were simply copied by Miss Smith without any member of the commission being present; that, after the list had been completed by the stenographer, the affidavit of the commissioners above was attached to such list, and the same then filed in the office of the district clerk.

This objection or challenge was overruled, and exception taken. A challenge to the individual grand jurors was also interposed and overruled.

Thereafter an application was made to this court for a writ of prohibition to prevent the district court from trying the defendant, Clark, upon any of the indictments so found. Upon the return this court dismissed the proceedings so far as they affected the action in the court below with reference to the in-

dictments, and this cause is now submitted on the question whether this court will prevent by prohibition the district court from proceeding to try Clark on the accusation returned against him.

The position assumed by the relator in the court below was this, in effect: I object to being tried on an accusation returned against me by this grand jury, for the reason that I, as a member of the jury commission, either willfully or in absolute disregard of my official duties failed and neglected to perform such duty, and, as the other members of such commission likewise failed in the performance of the duty imposed by law on them as members of such commission, therefore our own nonfeasance has left the county without any jury list from which a lawful grand jury might be selected to accuse, or a petit jury had to try, me for any criminal charge which might be presented against me; and this, too, notwithstanding I verified the list made and filed with the district clerk.

It may be said in passing that in the affidavit above, where the figures "1903" appear, there is clearly a clerical misprision. From the evidence taken on the hearing on the challenge to the grand jury it appears that what was intended in the affidavit was "1902," as the assessment roll for 1903 was not in existence at the time the affidavit was made.

The first question with which we are confronted is this: May a member of the jury commission, who by his own nonfeasance or active misfeasance in office as a member of such commission has rendered the selection of the jury list so irregular that as to others it might be invalid, take advantage of his own wrongdoing when called upon to answer a charge presented by a grand jury selected from such jury list? Or, in other words, will the courts hear a member of such commission, who has solemnly sworn that the jury commissioners did meet at the time and place designated by law, and did select the jury list from the last assessment roll, and that such list is correct and accurate, say now that the matters set forth in such affidavit are untrue, in order that he himself may escape the consequences of a trial

upon an accusation presented by a grand jury selected from such list? The plainest dictates of reason would say at once, "No." Whatever may be the rights of others, not members of such commission, to complain of the irregularities in the selection of such jury list, we hold that this relator's mouth is closed when he assumed to act as such commissioner, and has solemnly declared that the mandates of the law were met and fully complied with, to say that in fact he, as well as the other members of such commission, who also assumed to act as such, had so willfully or negligently disobeyed the law as to render the selection of a jury list wholly nugatory.

To say that the relator's position is tenable would be tantamount to saying that two members of a jury commission may commit any crimes known to the law, and absolutely defy punishment, or even trial, during their terms of office, by designedly vitiating the jury list and taking advantage of their own wrongdoing. It is not possible that any such condition of affairs can exist under, or be countenanced by, the law.

There is no reason apparent why the doctrine of estoppel which pervades the civil department of our law ought not to be applied in the criminal law.

In *State* v. *Spaulding*, 24 Kan. 1, the defendant was charged with embezzlement. He was city clerk of Leavenworth. Under the law applicants for licenses were required to pay the fee to the city treasurer, and take his receipt therefor, and upon presentation of this receipt to the city clerk the license was issued. However, in many instances applicants for such licenses paid the fee to the clerk, who received the money and issued the license. It was for the misappropriation of such funds that the clerk was charged with embezzling funds belonging to the city. The defendant contended that the funds did not belong to the city, because he had no right to receive them, and because they had not been turned over to the city treasurer; but the supreme court, in disposing of this contention, says: "The state rests upon the broad proposition that when a party assumes to act for another he is concluded by that assumption, no matter who else

is bound; that if A. assumes to act as the agent of B., and receives money belonging to B., he cannot thereafter deny that it is B.'s money, and that notwithstanding B. is not concluded by his acts, and though in fact he was not the agent of B.; that this doctrine, universally recognized in civil, is equally true in criminal, law.    A man may not say, 'I have the right to receive money,' and receive it, and then, when challenged for its receipt or embezzlement, avoid liability by saying, 'I had no right to receive it.'    He has voluntarily assumed a position the responsibilities of which he may not avoid.    The defendant may not say that he holds this money simply for the licensees, because he himself has issued the licenses, which he might rightfully issue only when the city had received the money; that by issuing he conclusively, so far as he was concerned, affirmed that the money he had received and was holding was city money.    The law of estoppel binds him whether it binds any one else or not, and is equally potent in a criminal as well as a civil action.    *
*    *    We do not affirm that the city was concluded by the defendant's acts, nor, indeed, that any one is estopped but himself. But we hold that when one assumes to act as agent for another he may not, when challenged for these acts, deny his agency; that he is estopped, not merely as against his assumed principal, but also as against the state; that one who is agent enough to receive money is agent enough to be punished for embezzling it."

In *State* v. *O'Brien,* 94 Tenn. 79, 28 S. W. 311, 26 L. R. A. 252, the doctrine announced in *State* v. *Spaulding,* above, is quoted with approval.    In this last case the defendant was supreme treasurer of a fraternal society organized under the laws of another state, and when charged with embezzling funds collected for such society in Tennessee he pleaded that the society had not complied with the laws of Tennessee, and therefore had no right to collect the funds in that state; but the supreme court brushed aside this contention, and, in addition to citing the *Spaulding Case* with approval, said: "Conceding that this corporation, organized, as is averred in the indictment, for benevolent purposes, is within the Act of 1891 (and this we do not

now determine), yet, if it should turn out in proof that the defendant, while acting as agent and employe of it, received money paid to him for his principal in the course of his employment, and then feloniously and fraudulently appropriated it to his own use, when indicted for the offense he cannot be permitted to defend himself from the criminal consequence of such wrongdoing upon the ground that his principal was carrying on its business in this state in violation of the terms of that Act. Upon the plainest principles, having assumed to receive this money for his nonresident principal, he is concluded, both civilly and criminally, by this assumption. Whatever others might say about the right of this foreign corporation to come into this state to carry on its business and acquire property interests without having first complied with the requirements of the Act of 1891, at any rate the defendant's mouth is closed when, as agent, he received the money of and for this corporation, and feloniously appropriates it to his own use. The wrongful act of the principal cannot be invoked as a protection against the still more wrongful act of the guilty agent. To him, under such circumstances, the rule of estoppel applies. * * * Without further discussion, we are content to adopt this rule of estoppel, so long recognized in the civil courts, as a proper one for enforcement in the criminal courts of this state, believing, as we do, that it rests on sound reason, and is supported by the weight of authority of eminent respectability."

In 2 Bishop's Criminal Law, 4th Ed., Section 367, the same doctrine is suggested as follows: "But why should not the rule of estoppel, known throughout the entire civil department of our jurisprudence, apply equally to the criminal? If it is applied here, then it settles the question; for by it, when a man has received a thing for another under the claim of agency, he cannot turn around and tell the principal, asking for the thing, 'Sir, I was not your agent in taking it, but a deceiver and a scoundrel.' When, therefore, the principal calls the man under these circumstances to account, the man is estopped to deny the agency he professed,—why, also, if he is then indicted for not

accounting, should he not be equally estopped on his trial upon the indictment?"

By law the selection of a list of persons from which grand or petit juries may be drawn is confided to the chairman of the board of county commissioners, the county treasurer and the county assessor (Section 240, Code of Civil Procedure), and to no others is this authority given; so that, if such officers breach their trust to such an extent as to render the list of no avail for jury purposes, the anomalous situation is presented of a county from which a valid jury may not be drawn until a proper list is selected, and that, too, through no fault of litigants or of the people generally. The seriousness of the situation is manifest. The law contemplates that at all times there shall be in readiness for use a proper list of persons from which juries may be drawn when required. Every litigant, in cases where a jury may be demanded as of right, and every person charged with crime, has a legal right to demand that the jury to try his cause shall be drawn and selected in a lawful manner, and every such person, speaking generally, may with perfect propriety urge any irregularity in the selection of the jury list; but to that rule this exception should be noted, viz., that whereas the people have confided to the jury commissioners the selection of such list to the end that the laws be administered with equal justice to all concerned, and such commissioners have assumed to act, and the public has relied upon such action, as it has a right to do, then, when the public's interests are concerned in the accusation or trial of one of such commissioners, the public will not be misled to its injury by permitting such commissioner to say that he violated his official duty, and now takes refuge behind such violation as a shield to protect himself against the acts of a jury selected from the very list he himself has solemnly declared was duly selected in the manner required by law and a faithful observance of his official duties.

As the corollary to this it follows that this court will not hear relator, Clark, say that by prohibition the lower court ought to

be restrained from proceeding to try him upon the accusation returned against him.

Relator also urges that prior to the time when such accusation was made the term of such grand jury had expired, as a new jury list had been prepared and filed on the second Monday of January, 1904; but this contention is not available.

Section 245 of the Code of Civil Procedure provides: "The persons whose names are so returned are known as regular jurors, and must serve for one year, and until other persons are selected and returned." Standing alone, this section might seem to bear out the relator's contention, but, when read in connection with other sections of that Code, its meaning becomes apparent. When the jury commissioners have made the list of names as directed by Section 240, they must file the same with the district clerk (Section 242), who must write the names on slips or ballots, and deposit them in jury box No. 1 (Section 243). Before depositing such ballots or slips, the clerk must first destroy all slips remaining in such jury box. (Section 244.) When a jury is desired, it is drawn from jury box No. 1. (Section 260.) Assuming, for the purpose of illustration, that there are 1,000 men in a given county qualified and liable for jury service, whose names have been regularly drawn by the jury commissioners, and the slips containing such names have been regularly deposited in jury box No. 1, but during the year only 100 of those names are ever drawn for actual jury service, upon new names being returned the slips containing the 900 other names must be destroyed, and those men would not have performed jury service at all. This illustration, in the light of the sections of the Code above referred to, only serves to emphasize the fact that the term "regular jurors," as used in Section 245, above, is applied to all persons qualified and liable for jury duty whose names were on the last assessment roll, for the presumption is that all such have been selected and returned by the jury commissioners. (Section 241.) But they are not jurors in the sense that they have been summoned to attend court, have been examined under oath touching their qualifica-

tions to act as such, and have been regularly chosen by the court for such service. They are jurors in the sense that they have been set apart as eligibles, liable to be called upon to perform jury duty; liable to be called upon to perform such duty at any time within the year for which they were chosen by the jury commissioners when the list comprising their names was made up, and until other names are selected; and in this sense only do they serve as jurors for such prescribed term. If, then, the district court selected this grand jury from jury box No. 1, and such selection was made during the year 1903, or before the new list for 1904 had been filed, then the law in this regard was complied with, and the jury so selected was regularly constituted (assuming that all preceding steps had been regularly taken, which relator in this instance is not permitted to dispute) and qualified to perform the services for which it was chosen, even though the performance of such service should not be completed before the next jury list was selected and filed. In other words, the term of service mentioned in Section 245 has reference to the term during which a jury may be selected from such names, and not to the term during which such actual jury duties shall be performed. (*State ex rel. Dunn* v. *Noyes,* 87 Wis. 340, 58 N. W. 386, 27 L. R. A. 776, 41 Am. St. Rep. 45; *In re Gannon,* 69 Cal. 541, 11 Pac. 240, approved in *Kelly* v. *Wilson,* (Cal.) 11 Pac. 244; *People* v. *Leonard,* 106 Cal. 302, 39 Pac. 617.)

For the reasons herein given, the alternative writ heretofore issued is quashed, and the proceedings are dismissed.

*Dismissed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE MILBURN concur.

Rehearing denied January 3, 1905.